UNITED FOOD & COMMERCIAL WORKERS UNION LOCAL 442, et al., Plaintiffs,

v.

CITY OF VALDOSTA, et al., Defendants.

Civ. A. No. 93–43–VAL (WDO).

United States District Court,
M.D. Georgia,
Valdosta Division.

Aug. 29, 1994.

James Danly Fagann, Jr., Marcia Weil Borowski, Atlanta, GA, for plaintiffs.

Cubbedge Snow, Jr., Jay Clifford Traynham, Macon, GA, George T. Talley, William A. Turner, Jr., Valdosta, GA, for City of Valdosta and Charlie R. Spray.

E. Scott Smith, Michael J. Minerva, Atlanta, GA, for Publix Supermarkets, Inc.

## ORDER

OWENS, Chief Judge.

On May 11, 1993, Locals 442 and 1063 of the United Food and Commercial Workers Union brought suit against the City of Valdosta, Georgia, Valdosta Chief of Police Charlie R. Spray, and Publix Supermarkets, Inc., under 42 U.S.C. § 1983, challenging the constitutionality of Chapter 2, Article B of the Valdosta City Code. The parties have agreed that the court may decide the issue of the facial constitutionality of the challenged code sections on the record before the court and without an evidentiary hearing.

## FACTS

On December 3, 1992, members of Local 442 and Local 1063 of the United Food & Commercial Workers Union ("Union") began picketing in front of the Publix Supermarket located in Valdosta, Georgia. The Valdosta Publix Supermarket is located in the Valdosta Mall shopping center. Shortly after the picketing started, several police officers arrived and told the demonstrators that they were trespassing on private property and would have to leave. The demonstrators left the front of the Publix Supermarket and relocated to public areas near the entrances to the shopping center. The Valdosta Mall shopping center has seven public shopping center entrances. The officers then informed the demonstrators that pursuant to Chapter 2, Article B of the Valdosta City Code, a permit was required to demonstrate on public property. Fearing arrest, the demonstrators ceased picketing. However, later that day, two officials of the Union met with Valdosta Police Chief Charlie R. Spray and acquired the appropriate permits.

On December 4, 1992, the demonstrators returned to the shopping center entrance to resume picketing. However, pursuant to the permit granted by Chief Spray, the demonstrators were limited to two of the seven entrances to the shopping center.

On May 11, 1993, the Union brought suit against the City of Valdosta, Chief Spray, and Publix Supermarkets, Inc., under 42 U.S.C. § 1983, challenging the constitutionality of Chapter 2, Article B of the Valdosta City Code.

Chapter 2, Article B of the Valdosta City Code provides:

"*Section 7–2011. Purpose.*

"The city has a duty to prevent violence, maintain order and protect the right of persons and property to move upon public streets, roads, sidewalks, alleys, and all other places subject to a public easement of travel; to provide an environment conducive to the effective administration of justice and other essential governmental functions, the transaction of public and private business; and to promote the right of all persons to be free from substantial invasions of their privacy in an essentially intolerable manner. This duty is limited by the fundamental right of every person to express his opinions, disseminate information and opinion, to peaceably assemble, and to petition government for redress of grievances as guaranteed by the First and Fourteenth Amendments to the United States Constitution. The purpose of this article is to promote the discharge of these duties while preserving the fundamental freedoms enumerated.

"*Section 7–2012. Definitionss.*

"For purposes of this article the following terms shall have the described meanings:

"(1) *Block* shall mean that portion of any street or sidewalk that falls between its intersections with two (2) other streets.

"(2) *Person* shall mean any natural human being, artificial legal being, or any combination of natural and/or artificial beings whether formal or informal, public or private.

"(3) *Handbilling* shall mean the activity of a person or persons in a place open and accessible to the general public, distributing any circulars, handbills, advertising or other printed, written or symbolic matter on any subject and for any purpose.

"(4) *Soliciting* shall mean the activity of a person or persons in a place open and accessible to the general public who by spoken language directed to persons in the vicinity attempt to disseminate facts or opinions regarding any subject with intent to induce a specific response from any listener.

"(5) *Picketing* shall mean either the act of (i) patrolling a particular geographic area by one or more persons as an expression of a point of view with respect to any subject of actual or potential dispute for the purpose of publicizing that viewpoint and with the further purpose of inducing a specific response from persons actually found or likely to be found in the locality, or of (ii) handbilling or soliciting by four (4) or more persons in furtherance of a common purpose within a single block or one hundred (100) feet or less of one another, whichever is the shorter distance.

"(6) *Picket* shall mean any person who is engaged in the act of picketing.

"(7) *Mass picketing* shall mean picketing by a sufficient number of pickets in a manner that effectively prevents other persons with a right to be in the vicinity of the picketing from exercising their right to utilize the area, or facilities therein, for the purposes to which it has been dedicated either by physical domination of the area or by threats, intimidation or coercion actually arousing or having a tendency to arouse a fear of bodily harm with respect to any person who does not comply with the wishes of the pickets; provided, however, that the congregation of three (3) or more pickets for a common cause at the same location, in the presence of other persons not pickets within a distance of fifteen (15) feet or less of one another shall be presumed to be mass picketing unless the contrary is shown by clear evidence.

"(8) *Public assembly* shall mean a gathering of more than eight (8) persons for a common purpose in a place open to the general public as a result of prior planning or a spontaneous gathering for a common purpose in a place open to the general public that continues in existence for more than thirty (30) minutes.

"(9) *Parade* shall mean a coordinated movement of two (2) or more pedestrians or vehicles upon the streets, parks or other public grounds within the city with an intent of attracting public attention that interferes with or has a tendency to interfere with the normal flow or regulation of traffic upon the street, park or other public ground; provided, however, that "parade" shall not be construed to include picketing within a limited geographic area.

"(10) *Procession* shall mean a public assembly that moves as a unit on the streets, sidewalks, parks, or other public grounds or places within the city for the dominant purpose of moving the location of the assembly from its point of origin to a predetermined destination.

"(11) *Public park* shall mean any land area within the city, owned by the city, predominantly open to the elements, open and freely accessible to the general public, and primarily dedicated to providing a public place to relax, meet, socialize, eat and drink, and/or engage in recreational activities or other pleasurable pursuits.

"(12) *Fighting words* are words which are not protected as speech by the First Amendment to the United States Constitution, are not in an reasonable sense communication of information or opinion, and are generally epithets or personal verbal abuse directed towards another person in his presence that by their very utterance inflict injury or tend to incite an immediate breach of the peace; fighting words frequently include threatening, profane or obscene revilings, mass name-calling (that is, concerted or coordinated name-calling by two (2) or more persons with intent to annoy, ridicule, insult or provoke a violent reaction) and will not ordinarily include derisive or annoying words except when these have the characteristic of plainly tending to incite the addressee to commit an immediate breach of the peace; in every case the circumstances of the utterance control

whether particular words fall within this definition.

"*Section 7–2013. Limitations on the right to handbill and solicit.*

"(a) Handbilling or soliciting in the streets, alleys, roads, highways, driveways or other places predominantly dedicated to the use of vehicular traffic is prohibited.

"(b) The blocking of the path of any pedestrian or vehicle by an handbiller or solicitor with intent to compel such pedestrian or vehicle to halt its movement for the purpose of rendering such pedestrian or vehicle a captive audience for the solicitations of the picket or to compel the acceptance of any leaflet or handout in return for passage is prohibited.

"(c) The making by a handbiller or solicitor of any threat of bodily harm or property damage to any person whether directed to such person or said with respect to some other person bearing a close relationship to such person or the use of any fighting words by a handbiller or solicitor is prohibited.

"(d) Handbilling or soliciting in a manner that interferes with or is likely to interfere with another person's performance of the duties of his employment is prohibited.

"(e) The possession by any handbiller or solicitor of any object or instrumentality with an apparent potential to cause physical injury to persons or damage to property is prohibited: objects and instrumentalities encompassed by this prohibition include, but not to the exclusion of others not herein enumerated, walking or hiking sticks, canes, clubs, knives, firearms, brass knuckles, slingshots, zip guns, pellet guns, rocks, glass bottles, stones and bricks, or any other potential missile or club, tear gas, mace, or any other chemical projectile, any incendiary, stench, coloring or drying chemical or vicious animal.

"(f) No person shall handbill or solicit in violation of any of the foregoing prohibitions.

"*Section 7–2014. Limitations on the right to picket.*

"(a) Mass picketing is prohibited as an unlawful infringement upon the public right to travel freely on public streets, sidewalks, parks and grounds without fear of personal bodily harm or coercive or intimidating persuasion.

"(b) Picketing in streets, alleys, roads, highways, driveways or other places predominantly dedicated to the use of vehicular traffic is prohibited.

"(c) The blocking of the path of any pedestrian or vehicle by any picket with intent to compel such pedestrian or vehicle to halt its movement for the purpose of rendering such pedestrian or vehicle a captive audience for the solicitations of the picket or to compel the acceptance of any leaflet or handout in return for passage is prohibited.

"(d) The making by a picket of any threat of bodily harm or property damage to any person whether directed to such person or said with respect to some other person bearing a close relationship to such person or the use of any fighting words by a picket is prohibited.

"(e) The picketing of any private home, residence or domicile is prohibited as an unlawful infringement on the right of privacy and the right to be free from fear and intimidation.

"(f) Picketing in a manner that interferes with or is likely to interfere with another person's performance of the duties of his employment is prohibited.

"(g) The possession by any picket of any object or instrumentality with an apparent potential to cause physical injury to persons or damage to property is prohibited: objects and instrumentalities encompassed by this prohibition include, but not to the exclusion of others not herein enumerated, walking or hiking sticks, canes, clubs, knives, firearms, brass knuckles, slingshots, zip guns, pellet guns, rocks, glass bottles, stones and bricks, or any other potential missile or club, tear gas, mace, or any other chemical projectile, any incendiary, stench, coloring or drying chemical or vicious animal.

"(h) No person shall picket in violation of any of the foregoing prohibitions.

"*Section 7–2015. Limitations of the right to assemble.*

"The public parks of the City are hereby declared to be public forums dedicated to,

among other purposes, the dissemination of information and opinion protected by the First Amendment to the United States Constitution, or other protected expressive conduct in furtherance of which purpose said parks may be used for public gatherings and assemblies; all other public and quasi-public places in the City are declared to be off-limits to public assemblies except those held on private property with the consent of the owner or on public property incident to open meetings of governmental bodies or agencies: provided, however, that any public assembly that conducts itself in a fashion as will establish a purpose or likelihood of causing or encouraging imminent violence, or a purpose of intimidation or coercion directed at any person or person, thereby becomes unlawful; and provided further that the following additional limitations shall apply:

"(1) The right to assemble is restricted by the prohibitions on the right to picket expressed in subsections (a), (c), (d), (f), and (g) of section 7–2014 of this article and subject to the licensing provisions provided in section 7–2016 hereof; soliciting, handbilling and picketing in parks also shall be regulated as provided in sections 7–2013 and 7–2014 hereof.

"(2) Public assemblies upon the streets, roads, highways, sidewalks, driveways, and alleys within the City predominantly dedicated to vehicular traffic are prohibited.

"(3) Public assemblies upon private property without the consent of the owner are prohibited.

"(4) Public assemblies prior to eight o'clock A.M. or subsequent to eleven o'clock P.M. are prohibited.

"(5) Public assemblies that thwart the purpose to which the property upon which they occur is dedicated or that interfere with the normal use of such property by others with an equal right of access thereto or there are prohibited.

"(6) Public assemblies that are inconsistent with or interfere with the rights of another group to assemble pursuant to a valid permit issued by the City Manager pursuant to section 7–2016 of this article are prohibited.

"(7) Whenever the number of attendees at a public assembly exceeds the natural capacity of the facility so as to threaten the public safety or convenience the excess may be ordered to disperse by City law enforcement officials and failing to do so may be punished as provided by this article. Wherefore, the City Manager, after careful study of facilities within the City limits that are available for public assemblies, shall issue regulations setting forth the maximum capacity of each such facility so that the existence of an overflow crowd may be determined by a numerical count.

"(8) Public assemblies that violate the anti-noise ordinances of the City are prohibited.

"(9) Any public assembly in which a weapon as described in subsection 7–2014(g) hereof is in the possession of any party thereto is prohibited.

"(10) The use of fighting words by any person in any public assembly is prohibited.

"(11) Any public assembly that violates any of the above-numerated prohibitions thereby loses its protected status and must disband upon order of law enforcement officials of the City.

"(12) No person shall assemble in violation of any of the foregoing prohibitions.

"*Section 7–2016. Preferential treatment of licensed assemblies.*

"(a) Although the acquisition of a permit is not a condition to the right to assemble within public parks of the City, nevertheless where two (2) or more groups seek to use simultaneously the same area of the same park or otherwise make overlapping or inconsistent demands for public facilities, the group having the first duly issued permit shall have the right to use such facilities pursuant to the terms of the permit.

"(b) No group, person or organization shall be issued a permit in preference to a valid written request for the same facility at the same time by another group that has utilized the same facility fewer times within the preceding ninety (90) day period.

"(c) An application for an assembly permit to be deemed valid must be filed at the office of the City Manager during normal business hours not less than seventy-two (72) hours prior to the proposed commencement hour of the applicant assembly and must set forth the following information:

"(1) The full legal name of the sponsoring person or persons;

"(2) A bona fide mailing address for each sponsoring person;

"(3) The State of incorporation of any incorporated person;

"(4) With respect to any resident agent for service of process of the sponsoring person:

"a. The full legal name of the agent; and

"b. The address of the agent's place of business and his personal residence and the telephone number for each;

"(5) If a sponsoring person has no registered agent for service of process:

"a. A brief statement of the reason for failing to appoint one; and

"b. The full name, business and residential address of a local resident who will stand surety for the sponsoring party for any damage caused by participants in the assembly;

"(6) The date, hours, and site sought for the assembly;

"(7) The number of persons expected to attend the assembly, if known, and the basis for the estimate if an estimate is made; if no estimate is made, the reason why a reasonable estimate cannot be made (example, the principal purpose for the assembly is to bring together previously unorganized persons presently unknown to the sponsoring person to join the sponsoring persons in a common purpose); and

"(8) The application shall be signed by each sponsoring person or its legal representative.

"The City Manager shall cause to be prepared a form to be used for application for parade permits which shall be approved by the Mayor and Council prior to utilization.

"(d) The City Manager shall cause to be verified all information contained in an as-

sembly permit application that has been completed in full as provided by subsection (c) hereof and upon such verification shall issue a permit that shall state:

"(1) The date and hours of the assembly;

"(2) The location and the maximum number of attendees for the assembly as provided in subsection (c) hereof;

"(3) The name of the sponsoring persons and the names and addresses of their agents for service or process or their local sureties;

"(4) The date of filing the permit application;

"(5) The date the permit issued; and

"(6) The personal signature of the City Manager or his designee: provided, however, that the information in an incomplete application shall not be verified, and a permit shall not issue on an unverified application.

"(e) The City Manager shall cause to be prepared forms for (1) application for an assembly permit and (2) for assembly permits which shall be approved by the Mayor and Council prior to utilization.

"(f) Any assembly held in accordance with a duly authorized permit shall not be entitled to preferential treatment unless the actual permit is in the possession of a member of the assembly who make himself available to display same on demand to any person who requests to examine the same.

"*Section 7–2017. Limitations on parades.*

"(a) Parades within the City are declared unlawful except when conducted pursuant to the authority of a lawfully issued parade permit; the parade route must be sealed off by traffic enforcement officers of the City before the period during which the parade permit authorized the parade, and no other traffic shall be permitted thereon for the duration of the parade.

"(b) Upon satisfaction of the following requirements the City Manager shall cause the required permit to be issued to any applicant therefor:

"(1) A written application for permit must be filed at least 168 hours in advance of the proposed parade time which application shall specify the requested date, hours, place of

assembly for such parade, the route, the length and expected duration of such parade, and the place and time for disbandment of such parade;

"(2) There must be no previously filed requests for parade permit for the same day;

"(3) The application for a parade permit shall be signed by a sponsoring person or a legal representative thereof and must also set forth the following information:

"a. The full legal name of the sponsoring person or persons;

"b. A bona fide mailing address for each sponsoring person;

"c. The State of incorporation of any incorporated person;

"d. With respect to any resident agent for service of process of the sponsoring person:

"1. The full legal name of the agent; and

"2. The address of the agent's place of business and his personal residence and the telephone number for each;

"e. If a sponsoring person has no registered agent for service of process:

"1. A brief statement of the reason for failing to appoint one; and

"2. The full name, business and residential address of a local resident who will stand surety for the sponsoring party for any damage caused by participants in the assembly;

"(4) The City Manager shall cause to be prepared a form to be used for application for parade permits which shall be approved by the Mayor and Council prior to utilization; and

"(5) A permit fee shall be paid in advance of issuance of a parade permit the amount of which shall be fixed from time to time by the Mayor and Council based upon the cost to the City for providing necessary traffic and crowd control facilities, equipment and personnel for parades.

"(c) A parade permit shall not be issue unless the parade:

"(1) Will follow a route accurately described within a written application for a parade permit which route does not intrude into residential or hospital zones of the City;

"(2) Will not continue from the time of the initial gathering upon the public streets until its final disbursement for a term of more than three (3) hours;

"(3) Will transpire only after 9:30 A.M. and before 2:00 P.M. on school days, or before 4:00 P.M. on non-school days, or subsequent to 6:30 p.m. and prior to 10:00 P.M., on any day except Sundays; and

"(4) Will consist of an aggregate length of vehicles, pedestrians and equestrians of at least one hundred (100) yards.

"(d) All parade permits shall be issued subject to the conditions that:

"(1) All traffic and safety regulations duly promulgated by the City Manager and approved by the Mayor and Council in furtherance of the public health, safety and convenience are complied with;

"(2) No vehicle may travel abreast of another vehicle during the parade and each vehicle measuring more than ten (10) feet in width must parade in the center of the street; and

"(3) No vehicle or equestrian may come within six (6) feet of either side of the street, that is, the curb of any sidewalk or the nearest protrusion of any parked automobile or other vehicle along the street whichever is closest to the center.

"Section 7–2018. Limitations on processions.

"(a)(1) A permit shall not be required for any procession.

"(2) A procession unaccompanied by a police escort must comply with each and every traffic law and regulation of the City irrespective of the impact such compliance has upon the continuity or regularity of that procession. A non-escorted procession must be in continuous motion except for traffic lights and signals and must not obstruct the entrances or exits of any establishment of any kind or interfere with free passage upon any road, sidewalk, alley, driveway or other passageway. Should a pedestrian procession unlawfully cease its motion on a public street or sidewalk or other passageway it ceases to

be a procession subject to regulation under this section and becomes a public assembly subject to regulation under section 7–2015 hereof.

"(3) A procession accompanied by a police escort may continue without break through stop signs, traffic lights, yield signs and the like so long as each vehicle maintains a close but safe distance with the immediately preceding vehicle and keeps its headlights turned on to indicate its participation in the procession.

"(4) A police escort will be provided to any procession for a lawful purpose upon application identical to requirements of the parade permit application form but filed at least twenty-four (24) hours prior to the designated commencement of same upon the further condition that the City has a police officer available at the designated time for this service. The fee, the amount of which is to be fixed from time to time by the Mayor and Council will be charged for police escort service and must be paid upon filing of the application for an escort. The fee shall be based upon the cost to the City for providing necessary traffic and crowd control facilities, equipment and personnel for the procession.

"(b)(1) A pedestrian procession may not consist of more than two (2) files nor more than six (6) ranks except that after six (6) ranks of two (2) files followed by a distance of twenty (20) feet, another six (6) ranks of two (2) files may follow ad seriatum until the entire procession is accommodated; unorderly pedestrian processions are prohibited as an interference with the rights of others to use the public sidewalks and streets.

"(2) A pedestrian procession must comply with each and every traffic regulation and signal.

"(3) Pedestrian procession participants may carry placards or signs not exceeding two (2) feet in width and two (2) feet in length nor carried in a fashion that tends to obstruct the free movement of other members of the public using same sidewalk for movement or otherwise create a safety hazard.

"(c) Any member of a procession who violates a traffic regulation or ignores any traffic signals or creates an obstruction not permitted by this subsection shall be punished by imprisonment not exceeding three (3) days or fined not exceeding fifty dollars ($50.00) or both.

"(d) Any procession that engages in loud and boisterous conduct or expression thereby loses its character as a procession within the meaning of this article and becomes a parade within the meaning of this article and subject to the rules and regulations applicable to a parade.

"(e) Any parade or procession involving the following conduct is unlawful and must disperse upon order of law enforcement officials:

"(1) The use of any fighting words by any participants; or

"(2) The possession of any deadly weapon as defined in subsection 7–2013(e) hereof by any participant.

"Section 7–2019.  Interference with public agencies.

"(a) No person, singly or in concert with others, shall engage in picketing in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any public premises, State property, County or municipal courthouse, City Hall, public office building, jail or any other public building or facility owned by the United States, the State, The County, or the City, or with the transaction of public business or the administration of justice conducted therein or thereon, or so as to obstruct or unreasonably interfere with the free use of public streets, sidewalks or other public ways adjacent or continuous thereto.

"(b) No person, with intent to interfere with, obstruct, or impede the administration of justice, or with intent to influence any judge, juror, witness or officer of a court in the discharge of his duty, shall picket or parade in or near a building housing a court of the United States, the State, the County, or any other duly constituted governmental agency.

"Section  7–2020.  Miscellaneous provisions.

**1580**

"(a) The express enumeration of powers and rights herein shall not be deemed a waiver of similar or related powers or rights inherent to municipal governments or delegated to municipal governments by the State.

"(b) No person shall hamper, obstruct, or interfere with any parade, picket line or public assembly being conducted under the authority of a permit duly issued by the City Manager.

"(c) This article shall be construed liberally in a manner that will effectuate its purposes so as to avoid the creation of any conflict with any valid State or Federal law and so as to avoid regulation of any conduct or activity, the regulation of which has been preempted by a valid State or Federal law."

## DISCUSSION

"The central commitment of the First Amendment ... is that 'debate on public issues should be uninhibited, robust, and wide-open.'" *Bond v. Floyd,* 385 U.S. 116, 136, 87 S.Ct. 339, 349, 17 L.Ed.2d 235 (1966); *see also Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969) ("It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail"). Further, "[b]y protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information." *Pacific Gas & Electric v. California P.U.C.,* 475 U.S. 1, 8, 106 S.Ct. 903, 907, 89 L.Ed.2d 1 (1986).

■ "Governmental limitations on the exercise of First Amendment rights in traditional public forums, are proper only when they are valid time, place and manner restrictions which are content-neutral, are nar-

rowly tailored to serve significant governmental interests and leave open ample alternative channels of communication." *Central Florida Nuclear Freeze Campaign v. Walsh,* 774 F.2d 1515, 1523 (11th Cir.1985). Parks, sidewalks and streets are generally considered traditional public forums. *See Sentinel Communications Co. v. Watts,* 936 F.2d 1189, 1201 (11th Cir.1991); *United States v. Belsky,* 799 F.2d 1485, 1489 (11th Cir.1986); *Walsh,* 774 F.2d at 1522.[1]

### I. Section 7–2015 of the Valdosta City Code

■ Section 7–2015 of the Valdosta City Code provides:

The public parks of the City are hereby declared to be public forums dedicated to, among other purposes, the dissemination of information and opinion protected by the First Amendment to the United States Constitution, or other protected expressive conduct in furtherance of which purpose said parks may be used for public gatherings and assemblies; *all other public and quasi-public places in the City are declared to be off-limits to public assemblies* except those held on private property with the consent of the owner or on public property incident to open meetings of governmental bodies or agencies....

.　　.　　.　　.　　.

Public assemblies upon the streets, roads, highways, sidewalks, driveways, and alleys within the City predominantly dedicated to vehicular traffic *are prohibited.*

.　　.　　.　　.　　.

Public assemblies prior to eight o'clock A.M. or subsequent to eleven o'clock P.M. *are prohibited.*

1. Plaintiffs' constitutional challenge to Chapter 2, Article B of the Valdosta City Code includes challenges to sections of the code that have not been directly applied to restrict plaintiffs' First Amendment rights. Nonetheless, plaintiffs have standing to challenge these sections under the "overbreadth" doctrine.

　In the context of the First Amendment, the Supreme Court has fashioned a special rule of standing known as "overbreadth." The Court has recognized that a statute that regulates a broad category of speech may deter expression

that is protected by the First Amendment even if the statute has some range of constitutional application. The effect of the overbreadth doctrine is "to enable persons who are themselves unharmed by the defect in the statute nevertheless to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court."
*Dimmitt v. City of Clearwater,* 985 F.2d 1565, 1571 (11th Cir.1993).

Valdosta City Code § 7–2015 [hereinafter Code] (emphasis added). As discussed above, to justify the time, place and manner restrictions imposed by section 7–2015, defendants must prove: (1) that the restrictions are content-neutral; (2) that the restrictions are narrowly tailored to serve significant governmental interests; and (3) that the restrictions leave open ample alternative channels of communication.

■ "[The] principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech 'without reference to the content of the regulated speech.'" *Madsen v. Women's Health Center, Inc.*, —— U.S. ——, ——, 114 S.Ct. 2516, 2523, 129 L.Ed.2d 593 (1994). After a careful review, the court finds no reference in Chapter 2, Article B of the Valdosta City Code that would indicate a preference for, or hostility to, a particular viewpoint. Accordingly, the challenged sections of the city code are content neutral for purposes of First Amendment analysis.

The second part of the test requires defendants to prove that the content-neutral restrictions are narrowly tailored to serve significant governmental interests. According to defendants, the "significant governmental interests" served by section 7–2015 include:

a duty to prevent violence, maintain order and protect the right of persons and property to move upon public streets, roads, sidewalks, alleys, and all other places subject to a public easement of travel; to provide an environment conducive to the effective administration of justice and other essential governmental functions, the transaction of public and private business; and to promote the right of all persons to be free from substantial invasions of their privacy in an essentially intolerable manner.

Code § 7–2011. Although defendants have articulated a comprehensive list of interests served by section 7–2015, the court finds that section 7–2015 sweeps far too broadly in attempting to serve those interests. A com-

plete ban on all public assemblies taking place outside a public park is not narrowly tailored to serve the interests outlined above. Further, a blanket prohibition of all public assemblies "upon the streets, roads, highways, sidewalks, driveways, and alleys within the City predominantly dedicated to vehicular traffic," (Code § 7–2015(2)), deprives citizens of the opportunity to express their views in public forums particularly suited to open assembly, discussion, and debate. Finally, section 7–2015's ban on all public assemblies "prior to eight o'clock A.M. or subsequent to eleven o'clock P.M." does not take into account the variety of expressive activity upon which this restriction may place an unreasonable burden.[2]

In addition, defendants have failed to show that the restrictions imposed by section 7–2015 leave open ample alternative channels of communication. Streets and sidewalks are traditional public forums not simply because of being labeled as such by courts, but because they provide ordinary citizens a forum in which to communicate their ideas, beliefs, and opinions to the public at large. The restrictions imposed by section 7–2015 do not leave open channels of communication equal to those available in the streets, sidewalks and other forums traditionally open to public discourse. Accordingly, the court holds that section 2–7015 of the Valdosta City Code is unconstitutional on its face.

## II. Section 7–2014(b) of the Valdosta City Code

■ Section 7–2014(b) provides: "Picketing in streets, alleys, roads, highways, driveways or other places predominantly dedicated to the use of vehicular traffic *is prohibited.*" Code § 7–2014(b) (emphasis added). As discussed above, content-neutral restrictions on the exercise of First Amendment rights in traditional public forums such as streets, are valid only when narrowly tailored to serve significant governmental interests and when the restrictions leave open ample alternative channels of communication. Al-

---

**2.** This is not to say that this particular restriction may not be appropriate when applied to specific areas of the city—for example, residential neighborhoods. The court holds only that a broad

proscription of all public assemblies, wherever they may be conducted, is not narrowly tailored to serve the interests outlined in section 7–2011.

though the court recognizes that defendants have a significant interest in protecting "the right of persons and property to move upon public streets, roads, sidewalks, alleys, and all other places subject to a public easement of travel," the countervailing First Amendment interests demand that the restrictions be narrowly tailored. A broad prohibition of *all* picketing in *all* streets, alleys, roads, highways, and driveways predominantly dedicated to the use of vehicular traffic does not serve defendants' interests in the narrow fashion demanded by the First Amendment. Accordingly, the court holds that section 2–7014(b) of the Valdosta City Code is unconstitutional on its face.

### III. Section 7–2013(a) of the Valdosta City Code

■ Section 7–2013(a) provides, in part: "Handbilling ... in the streets, alleys, roads, highways, driveways or other places predominantly dedicated to the use of vehicular traffic *is prohibited.*" Code § 7–2013(a) (emphasis added). The analysis outlined in the two previous sections is also applicable to section 7–2013(a). *See infra* sections I & II. Although handbilling may, under certain circumstances, disrupt the flow of traffic on city streets, section 7–2013(a) sweeps so broadly as to encompass those circumstances under which handbilling would present little or no interruption of traffic. For example, section 7–2013(a) would prevent the distribution of literature at intersections with traffic lights. Defendants have set forth no significant governmental interest to be served by the prohibition of handbilling at intersections of city streets, roads, and alleys. As these are traditional public forums entitled to the highest level of scrutiny under the First Amendment, defendants are required to narrowly tailor any restrictions on the use of these forums by the public. Defendants, however, have failed to do so. Accordingly, the court holds that section 2–7013(a) of the Valdosta City Code is unconstitutional on its face.

**3.** Plaintiffs do not contend that the prohibition of parades within hospital zones is an unreasonable

### IV. Section 7–2017(c)(1) of the Valdosta City Code

■ Section 7–2017(c)(1) provides: "A parade permit shall not issue unless the parade ... [w]ill follow a route accurately described within a written application for a parade permit which route does not intrude into residential or hospital zones of the City." Code § 7–2017(c)(1). Plaintiffs assert that the ban on parades within all residential zones is an unreasonable restriction of First Amendment rights.[3] Defendants contend that the restriction serves "to protect the privacy of citizens within their homes" and to protect parade participants from traffic in residential neighborhoods. (Def.s' Br. at 6–7.)

In *Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), the United States Supreme Court held "that a public street does not lose its status as a traditional public forum simply because it runs through a residential neighborhood." *Frisby,* 487 U.S. at 480, 108 S.Ct. at 2500. Further, the court held that "generally directed means of communication ... may not be completely banned in residential areas." *Id.* at 486, 108 S.Ct. at 2503.

A parade is a form of "generally directed means of communication." As such, parades may not be completely banned in residential neighborhoods. Although defendants may place reasonable restrictions on the right to parade in residential areas, the activity may not be banned *in toto.* Accordingly, the court holds that section 2–7017(c)(1) of the Valdosta City Code is unconstitutional on its face.

### V. Section 7–2017(c)(3) of the Valdosta City Code

■ Section 7–2017(c)(3) provides: "A parade permit shall not issue unless the parade ... [w]ill transpire only after 9:30 A.M. and before 2:00 P.M. on school days, or before 4:00 P.M. on non-school days, or subsequent to 6:30 p.m. and prior to 10:00 P.M., on any day except Sundays." Code § 7–2017(c)(3). Plaintiffs contend that section 7–2017(c)(3)

restriction of First Amendment rights.

bans all parades on Sundays. Defendants, however, assert that parades are not banned on Sundays, only restricted to the hours between 9:30 A.M. and 4:00 P.M.

Although somewhat confusing, the text of section 7–2017(c)(3) does support defendants' contention. However, plaintiffs also assert that defendants have failed to articulate a significant governmental interest to be served by the restriction on parades taking place after 4:00 P.M. on Sundays. Although the court could speculate as to the type of interests that would be served by such a ban, it is not the court's responsibility to do so. Defendants bear the burden on this issue. Merely stating that "[i]t is ludicrous to suggest that a ... restriction on parades after 4:00 p.m. on Sunday is unconstitutional," (Def.s Br. at 7), does not satisfy defendants' burden. In the absence of any articulated interest to be served by the restriction, the court is unable to determine whether the restriction is narrowly tailored to serve a specific goal. Accordingly, the court holds that section 2–7017(c)(3) of the Valdosta City Code is unconstitutional on its face.

## VI. *Permit and Fee Requirements*

Plaintiffs assert that the permit and fee schemes contained in section 7–2017(a)–(d) place an unconstitutional prior restraint on activity protected by the First Amendment.[4]

### A. *Permit Requirement*

#### 1. Discretion in Issuing Official

■ "A law subjecting the right of free expression in publicly owned places to the prior restraint of a license, without narrow, objective and definite standards is unconstitutional." *Walsh,* 774 F.2d at 1525. Such standards serve to limit the discretion placed within the hands of the official issuing the permit. "It is not enough to presume that officials will act in good faith and adhere to standards absent from a statute or scheme's face. Implicit limits on a licensing official's discretion must be made explicit, 'by textual

incorporation, binding judicial or administrative construction, or well-established practice.'" *Sentinel Communications Co. v. Watts,* 936 F.2d 1189, 1199 n. 9 (11th Cir. 1991). However, if the official issuing the permit performs a purely ministerial function in determining whether objective registration criteria have been satisfied, then no discretion exists in the official "to engage in invidious discrimination against disfavored speakers...." *Church of Scientology v. City of Clearwater,* 2 F.3d 1514, 1548 (11th Cir.1993).

Pursuant to section 7–2017, the official issuing a parade permit performs nothing more than the ministerial task of ensuring compliance with narrow, objective and definite criteria. Section 7–2017 does not delegate to the issuing official overly broad discretion so as to operate as a prior restraint on First Amendment rights.

#### 2. Review Procedures

■ "A system of prior restraint must guarantee prompt and final judicial review of an executive determination to deny a license, so that an erroneous abridgment of freedom of speech may be corrected as quickly as possible in the adversarial setting of a courtroom." *Church of Scientology,* 2 F.3d at 1548 n. 46. On its face, section 7–2017 does not provide for judicial review of the denial of a permit. However, defendants assert that review is unnecessary as the issuing official is not delegated discretion to deny the permit, but is required to issue the permit upon compliance with the objective requirements of the city code.

Defendants are correct in that the discretion of the issuing official is severely limited by the requirements set forth in section 7–2017. However, the issuing official is still vested with a modicum of discretion in determining whether the section's requirements have been satisfied. Although this grant of discretion is not so broad as to constitute an unconstitutional prior restraint, it is sufficient to require that those seeking a permit

---

4. Plaintiffs have also challenged the permit scheme contained in section 7–2018 as imposing an unconstitutional prior restraint. However, the text of section 7–2018 clearly states that "[a] permit shall not be required for any procession."

A permit is required only if a police escort is requested by the participants in the procession. Under these circumstances, the court does not believe that section 7–2018 operates as a prior restraint.

be afforded prompt judicial review in the event a permit is denied. Accordingly, the court holds that section 2–2017 of the Valdosta City Code is unconstitutional on its face.

3. Fees

■ Plaintiffs assert that the fee scheme established in section 7–2017 operates as an unconstitutional, content-based restriction on activity protected by the First Amendment. "The right of free speech, exercised in a public forum, on issues of public concern, cannot be abridged by a governmental regulation which requires the speakers to prepay the costs of police protection, based on the content of the speaker's views." *Walsh,* 774 F.2d at 1524. The state may not delegate to an issuing official the discretion to set a fee based on the amount of police protection necessary to protect the speaker at issue. If such discretion were allowed, cities could charge higher fees for those seeking to espouse unpopular viewpoints in that increased police protection would be necessary. *See id.* These higher fees would operate to discourage the free exercise of First Amendment rights.

■ In the case *sub judice,* however, the fee is not set by the issuing official, but "from time to time by the Mayor and Council...." Code § 7–2017(b)(5). Although the mayor and council are directed to base the fee on the cost "to the City for providing necessary traffic and crowd control facilities, equipment and personnel for parades," there is no indication that any individual involved in the permit process is allowed to alter the pre-set fee in response to a particular speaker's views. Accordingly, on its face, section 7–2017 does not require "speakers to prepay the costs of police protection, based on the content of the speaker's views." *Id.*

### VII. Impermissible Mathematical Straightjackets

■ Plaintiffs contend that the definitions contained in sections 7–2012(5) and 7–2012(7) establish impermissible mathematical straightjackets on First Amendment activity. An impermissible "mathematical straightjacket" exists when an arbitrary mathematical formula is devised to prohibit activities

protected by the First Amendment. *See United Food & Commercial Workers International Union v. IBP, Inc.,* 857 F.2d 422, 430 (8th Cir.1988). For example, in *United Food & Commercial Workers International Union v. IBP, Inc.,* 857 F.2d 422 (8th Cir. 1988), the Eighth Circuit Court of Appeals held unconstitutional a state law that *prohibited* "any form of picketing 'in which there are more than two pickets at any one time within fifty feet of any entrance to the premises being picketed or within fifty feet of any other picket or pickets.'" *IBP, Inc.,* 857 F.2d at 430. In the case *sub judice,* however, the definitions contained in sections 7–2012(5) and 7–2012(7) do not operate to prohibit any activity. The sections simply attach a definitional label to a set of circumstances, imposing no restraints on the activity so-defined. As such, these definitions do not operate "as a[n] [impermissible] time, place, and manner restriction on expressive activities in a public forum." *Id.*

### VIII. Restrictions on Dangerous Instruments

■ Plaintiffs assert that sections 7–2013(e), 7–2014(g), 7–2015, and 7–2018(e), which prohibit "[t]he possession ... of any object or instrumentality with an apparent potential to cause physical injury to persons or damage to property ...," constitute an overly broad ban "on the carrying of virtually anything by any person engaged in First Amendment activities." (Pls' Br. at 27.) Plaintiffs contention, however, is without merit. The sections at issue set forth specific examples of prohibited objects. These objects include "walking or hiking sticks, canes, clubs, knives, firearms, brass knuckles, slingshots, [and] zip guns...." Code § 7–2013(e). Although the sections provide that the descriptive list is not exhaustive, the character of the objects set forth is clear. Accordingly, the court finds that sections 7–2013(e), 7–2014(g), 7–2015, and 7–2018(e) of the Valdosta City Code do not constitute an overly broad ban "on the carrying of virtually anything by any person engaged in First Amendment activities."

### IX. Overly Broad Definitions

Plaintiffs assert that the definitions contained in sections 7–2012(8) (public assembly), 7–2012(9) (parade), and 7–2012(10) (processions) are overly broad and encompass protected as well as unprotected activity. Every definition—no matter how narrowly drawn—will encompass activities not intended to be included within its scope. The United States Constitution does not require local governments to define regulated activity with such precision as only to encompass the specific actions to be regulated. *See City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984). The degree of precision demanded by plaintiffs is unattainable. Accordingly, the court holds that the definitions contained in sections 7–2012(8), (9), and (10) are drawn with sufficient particularity so as to survive constitutional analysis.

### X. Unconstitutionally Vague

Plaintiffs also assert the court should find sections 7–2013(e), 7–2014(g), 7–2015(a), 7–2018(e), and 7–2013(d) unconstitutionally vague in that they fail to provide reasonable notice as to what activities are proscribed. The void-for-vagueness doctrine "imposes an obligation on the government to give citizens fair notice of what constitutes punishable conduct and helps guard against arbitrary, unfair, or politically-motivated law enforcement." *United States v. Howard*, 655 F.Supp. 392, 398 (N.D.Ga.1987). After a careful review of the sections at issue, the court finds that the sections delineate with sufficient particularity the activity prohibited and provide adequate notice of "punishable conduct." Accordingly, the court holds that sections 7–2013(e), 7–2014(g), 7–2015(a), 7–2018(e), and 7–2013(d) are not void for vagueness.

### CONCLUSION

The court holds that sections 2–7013(a), 2–7014(b), 2–7015, and 2–7017 of the Valdosta City Code are unconstitutional in that they place an impermissible time, place and manner restriction on the exercise of protected First Amendment activities.

**SO ORDERED.**